IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RODNEY F. JACKSON,

    Plaintiff,

v.

NANCY A. BERRYHILL, *Acting Commissioner of Social Security*,

    Defendant.

CIVIL ACTION FILE NO.

1:16-cv-2939-TWT-JKL

**FINAL REPORT AND RECOMMENDATION**

    Plaintiff Rodney F. Jackson, who is proceeding *pro se*, seeks judicial review of the final decision of the Defendant Commissioner of Social Security ("Commissioner") denying his applications for a period of disability and disability insurance benefits and supplemental security income. Jackson contends that this case should be reversed and remanded because the administrative law judge ("ALJ") failed to properly evaluate the effect that his depression has on his ability to manage his physical symptoms. Liberally construing his argument, he claims that this resulted in a flawed residual functional capacity ("RFC") assessment. He

1

also submits new medical records with his appeal. After careful consideration of the record and the briefs of the parties, I **RECOMMEND** that the decision of the Commissioner be **AFFIRMED**.

## I.     PROCEDURAL HISTORY

On June 25, 2010, Jackson filed applications for a period of disability and disability insurance benefits and supplemental security income, alleging a disability onset date of September 1, 2008. (Tr. 404-14.) The applications were denied initially and on reconsideration. (Tr. 187, 196, 203.) Jackson initially had a hearing before an ALJ on May 1, 2012. (Tr. 89-116.) The ALJ issued an unfavorable decision, but the Appeals Council remanded the case for further proceedings. (Tr. 163-77, 183-85.) On remand before a different ALJ, Jackson testified at a hearing held on January 21, 2016. (Tr. 122-56.) The ALJ issued an unfavorable decision on March 2, 2016. (Tr. 22-38.) The Appeals Council denied Jackson's request for review. (Tr. 5-7.) The matter is now ripe for review.

## II.    STANDARD OF REVIEW AND FIVE-PART ANALYSIS

This Court must review the Commissioner's decision to ensure that it is supported by substantial evidence and is based upon the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Substantial

evidence is "more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Specifically, substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (quotation omitted). The Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," even if the evidence preponderates against the Commissioner's decision. *Bloodsworth*, 703 F.2d at 1239.

Under the regulations promulgated by the Commissioner, the ALJ must follow a five-step sequential analysis when evaluating a disability claim. 20 C.F.R. §§ 404.1520(a), 416.920(a). That analysis is as follows:

1. The ALJ first determines whether the applicant is currently working; if so, the claim is denied.

2. The ALJ determines solely on the basis of the medical evidence whether the claimed impairment is "severe"; that is, an impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities; if not, the claim is denied.

3. The ALJ decides, again, only using medical evidence, whether the impairment equals or exceeds in severity certain impairments described in the Commissioner's Listing of Impairments; if it does, the claimant is automatically entitled to disability benefits.

4. The ALJ considers whether the applicant has sufficient RFC, defined as what an individual "can still do despite his limitations," to perform the claimant's past work; if so, the claim is denied.

> 5. The ALJ decides, on the basis of the claimant's age, education, work experience, and RFC, whether the claimant can perform any other gainful and substantial work within the economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The claimant has the burden of proof during the first four steps. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs within the economy that the claimant can perform. *Id.* If the Commissioner makes that showing, then the burden shifts back to the claimant to prove that he is unable to perform those jobs. *Id.*

### III. FACTS

Jackson was 43 years old as of his alleged disability onset date. (Tr. 133, 404, 408.) He has a GED and most recently worked as a fast food worker and retail stock clerk, and he previously worked in a school cafeteria for about 10 years. (Tr. 134-39, 1611.) In 2010, Jackson moved from Iowa to Atlanta, Georgia, and at times, he has reported that he is homeless. (Tr. 133, 1612.)

#### A. Treatment history

In September 2008, Jackson visited friends who tried to steal money from him. (Tr. 693.) He chased after them but tripped and fell, breaking his ankle. (*Id.*) Jackson underwent open reduction and internal fixation ("ORIF") surgery. (Tr.

4

694-95, 699.) Jackson was pain free four months after surgery and, upon examination a year later, had full ankle range of motion. (Tr. 712-13.) In September 2009, he saw an orthopedist and reported sensitivity around the incision site and the surgical hardware used to hold the bone together. (Tr. 712-14.) The orthopedist concluded that his pain was likely related to the surgical hardware. (Tr. 714.) In February 2010, the hardware was surgically removed, and the surgeon debrided irregular joint surfaces. (Tr. 717, 721-24.)

In April 2010, Jackson presented at an Iowa hospital complaining of ankle pain, but he had full range of motion and normal strength, with only possible signs of degenerative joint disease. (Tr. 843-44.) He rode a bicycle and worked at a maintenance and custodial job that summer. (Tr. 807.) In September 2010, he began complaining of right knee pain, but imaging showed only minor joint effusion. (Tr. 796, 798.) Jackson is obese, and on several occasions, doctors have advised him to lose weight. (Tr. 798, 808 1446.) The record evidence shows that Jackson's BMI has improved. (*See* Tr. 134 (weight in 2016), 1419 (weight in 2011), 1446 (weight in 2012).)

Jackson has high blood pressure (Tr. 1633) and a history of asthma and wheezing, although in 2012 he stated that he has never had an asthma attack (Tr.

103). He uses an albuterol inhaler for his wheezing symptoms. (Tr. 1484, 1559.) He has a history of noncompliance with his blood pressure medication, at times because of the cost, and at times for other reasons. (*E.g.*, Tr. 911.) He once stopped taking his medications after losing them on the bus. (Tr. 941.) In January 2015, he reported to a doctor that he did not to take his blood pressure medication by choice. (Tr. 1635.) In any event, his hypertension is persistent, and his blood pressure has been as high as 155/69, but is sometimes normal. (*See* Tr. 1484, 1658.) Jackson also used a CPAP machine for his sleep apnea for several months when he lived in Iowa, but he did not know whether using the machine helped his symptoms. (Tr. 102-03.) On a few occasions, he has been prescribed Prozac. (Tr. 1236, 1547.)

By 2008, if not earlier, Jackson was using cocaine. (Tr. 695.) He had a history of alcohol and cocaine abuse by 2010. (Tr. 773.) Mental health staff at Grady diagnosed him with alcohol abuse in July 2013 (Tr. 1502), and in February 2014, paramedics brought him to the Grady emergency room for alcohol intoxication, headache, and nausea, (Tr. 1578.) He reported that he had drunk "three gallons" of whiskey and had used cocaine. (Tr. 1578.) In July and August 2015, he was consistently abusing drugs and alcohol (Tr. 1582-91, 1905-92), and in November 2015, he was admitted to Grady's psychiatric treatment unit after

expressing suicidal thoughts while using alcohol and cocaine. (Tr. 2005-18.) In December 2015, he presented at the emergency room and expressed suicidal thoughts, and doctors suspected he had been using cocaine. (Tr. 2024.) On December 31, 2015, however, Jackson completed a program at Grady on dealing with depression and substance abuse. (Tr. 127, 2026.)

### B. Statements concerning Jackson's behavior and activities

Because there was a diagnosis of malingering in Jackson's medical record, his case was referred to the Social Security Administration's Cooperative Disability Investigations program for a fraud investigation. (Tr. 1781.) Two witnesses told the investigator, a Georgia Bureau of Investigations inspector, that Jackson has a "Dr. Jekyll and Mr. Hyde" personality. (Tr. 1785-86.) When he is sober, he can have a "decent" conversation, understands what others are saying, and get along with others. When he is intoxicated, he antagonizes others, picks fights, and destroys property. His neighbors signed a petition to have him evicted because of his behavior when intoxicated. (*Id.*) A witness told the investigator Jackson regularly walked to school, and he spent a full day, from 8:00 or 9:00 a.m. to 5:00 p.m., out of the house on school days. (Tr. 1785.) Witnesses knew that

Jackson attended culinary classes, and one witness thought that he was a talented cook. (Tr. 1785-86.)

At the administrative hearing held on January 21, 2016, Jackson testified that he had recently graduated from a culinary school program that lasted two-and-a-half years. (Tr. 130.) It appears that he earned As, Bs, and Cs, although he denied doing as well in classes as his school transcript indicated. (Tr. 131-33.) He testified that he could sit, stand, or walk for about two hours. (Tr. 142.) He believed that he could lift about 30 pounds. (Tr. 142-43.)

At the time of the hearing, he was drinking three or four 24-ounce containers of alcohol each day. (Tr. 143.) He denied using cocaine daily because he could not afford it, but he still used it occasionally. (*Id.*) He testified that he was sober during a year of incarceration, but even then he had difficulty getting along with others when he was not abusing drugs and alcohol. (Tr. 145.) Despite his continued substance abuse, he attended AA meetings each day, and he could care for himself by dressing and bathing. (Tr. 144.) Jackson described his mood as depressed, and he felt tired and unmotivated. (Tr. 150.)

### C.     Opinion evidence

In 2010, when he was living in Iowa, Jackson had a mental status examination with Dr. Timothy Wahl, a psychologist. (Tr. 770.) Dr. Wahl did not formally test Jackson's intelligence but believed that he was in the "low average" range. (Tr. 773.) He opined that Jackson should be able to comprehend basic vocational instructions and procedures, he had intact attention, memory, and concentration, and he was capable of carrying out and remembering instructions and maintaining pace. He had mood difficulties and some antisocial features but was working and was motivated to start college. Dr. Wahl questioned whether Jackson had underreported his alcohol and cocaine abuse during the examination. Jackson was likely to have trouble with coworkers and supervisors, but in the past, he had had a long period of stable employment. (*Id.*)

Dr. Cheryl Gratton, a clinical neuropsychiatrist, conducted a consultative examination of Jackson on November 26, 2014. (Tr. 1610-14.) Dr. Gratton found that Jackson engaged in "frank and flagrant malingering" during objective testing, and his IQ of 64 was an underestimate of his actual intellectual functioning. (Tr. 1614.) Jackson could follow directions and timely complete tasks but would likely be challenged in getting along with others, particularly authority figures. Dr.

Gratton concluded that Jackson's history of depression was "likely associated with [his] ongoing substance abuse problems." (*Id.*)

On December 12, 2014, Dr. Kenneth Sanford conducted a consultative examination of Jackson to evaluate his physical symptoms. (Tr. 1616-22.) Dr. Sanford found normal range of motion and strength in his musculoskeletal examination. (Tr. 1617-18, 1620-22.) Notwithstanding the normal examination results, Dr. Sanford's diagnostic impressions and medical statement were based on Jackson's subjective reports and his reported medical history, except for his conclusion that Jackson was obese and his remark that Jackson could comprehend normal speech adequately. (Tr. 1618.)

### D. The ALJ's decision

In the decision dated March 2, 2016, the ALJ found that Jackson met the insured status requirements of the Social Security Act through December 31, 2011, and he had not engaged in substantial gainful activity since September 1, 2008. (Tr. 28.) Upon a thorough review of the record evidence, the ALJ found that Jackson had the following severe impairments: history of left ankle fracture status post-ORIF surgery, obstructive sleep apnea, obesity, asthma, hypertension, anti-social personality traits, depression, malingering, and poly-substance abuse. (Tr.

28-31.) The ALJ next concluded that Jackson did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 31-33.)

> Assessing Jackson's RFC, the ALJ found that Jackson could:
>
> perform light work . . . except he should never climb ropes, ladders, or scaffolding; he may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; he should avoid all exposure to humidity, irritants such as fumes, odors, dust, gases, poorly ventilated areas, hazardous machinery, and unprotected heights; he can perform work in a low stress job, defined as having no fixed production quotas, no hazardous conditions, and only occasional decision making or changes in the work setting, with only occasional interaction with the public and co-workers; further, he would be off task ten percent or more of the day, in addition to regularly scheduled breaks; and would miss two or more days of work per month due to a combination of impairments.

(Tr. 33.)

The ALJ concluded that there were no jobs in significant numbers in the national economy that Jackson could perform with his RFC. (Tr. 33-34.) That is not the end of the inquiry, however, because the record contained medical evidence of substance use disorders. (Tr. 27, 35-38.) The ALJ determined that, if Jackson stopped abusing drugs and alcohol, he would continue to have a severe impairment or combination of impairments, but he would not have any impairment or combination of impairments that met or medically equaled a listed impairment.

11

(Tr. 35-36.)  The ALJ further found that if Jackson stopped abusing drugs and alcohol, he would have the RFC:

> to perform light work . . . except he should never climb ropes, ladders, or scaffolding; he may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; he should avoid all exposure to humidity, irritants such as fumes, odors, dust, gases, poorly ventilated areas, hazardous machinery, and unprotected heights; he can perform work in a low stress job, defined as having no fixed production quotas, no hazardous conditions, and only occasional decision making or changes in the work setting, with only occasional interaction with the public and co-workers.

(Tr. 36.)

In reaching that RFC determination, the ALJ found that Jackson's medically determinable impairments could be expected to produce his symptoms, but his statements concerning the intensity, persistence, and limiting effects of his symptoms not fully credible.  (Tr. 36.)  The ALJ remarked that Jackson had good mental and physical abilities, because he went to culinary school—where he earned mostly Bs and Cs and obtained a diploma—and he walked one-and-a-half miles to school when he did not have enough money for bus fare.  (*Id.*)  The ALJ also noted that Jackson's complaints of pain were not supported by diagnostic imaging or evidence from physical examinations.  (Tr. 37.)

As to the opinion evidence, the ALJ gave great weight to the opinion of Dr. Gratton, because it was consistent with the overall evidence, and "slightly less weight" to the opinion of Dr. Shafer, a state agency medical consultant. (Tr. 37.) The ALJ gave little weight to Dr. Wahl's 2010 opinion because it did not reflect Jackson's more recent treatments and medications. He also gave little weight to Dr. Sanford's opinion, which was based on Jackson's subjective complaints rather than objective clinical or diagnostic testing. (*Id.*)

The ALJ next found that Jackson would be unable to perform past relevant work if he stopped the substance abuse, but he would be able to perform jobs such as price marker, routing clerk, or mail clerk. (Tr. 37.) The ALJ relied on the testimony of a vocational expert in making that determination. (Tr. 38.) The ALJ therefore found that Jackson was not disabled. (Tr. 38.)

## IV. DISCUSSION

### A. The parties' arguments

Jackson argues that the ALJ erred in assessing his RFC. [Doc. 26.] Specifically, he argues that the ALJ failed to consider the combined effect of his mental impairments and his physical impairments. [*Id.* at 2-3.] He argues that his depression and anxiety affect his ability to manage pain. Thus, he has more difficulty than an average person does in managing the pain from his osteoarthritis

and the feelings of dizziness from his high blood pressure. [*Id.*] He also has attached to his brief a letter showing that he sought treatment from a behavioral health specialist in January 2017, and had an appointment scheduled for February 2017. [*Id.* at 4, 6.]

The Commissioner responds the ALJ's determination that Jackson had good mental and physical functional capabilities when not under the influence of drugs and alcohol was supported by substantial evidence. [Doc. 27 at 7-11.] Jackson reportedly had a good demeanor when not under the influence of drugs or alcohol, and he had been able to work at times since his alleged disability onset date and received mostly B's and C's in culinary school. [*Id.* at 10-11.] The Commissioner points out that alcohol and drugs contributed to most of Jackson's hospital visits, and substance abuse was frequently his primary diagnosis. [*Id.* at 11.] Finally, the Commissioner argues that remand is not warranted under sentence six of 42 U.S.C. § 405(g), based on Jackson's submissions of new medical records with his brief, which merely show that he had two mental health treatments a year after the ALJ's decision. [*Id.* at 11-12.]

**B.     The ALJ's determination that Jackson would no longer be disabled if he stopped abusing drugs and alcohol is supported by substantial evidence.**

The ALJ's assessment of Jackson's RFC if he stopped abusing drugs and alcohol is supported by substantial evidence. In assessing his RFC, the ALJ considered the objective medical evidence as well as evidence concerning Jackson's activities and his accomplishments at school. Jackson regularly walked to school and completed a course of study in culinary classes. He has normal range of motion in his joints and back and had normal strength during a neurological exam. The ALJ assessed the medical opinion evidence and gave appropriate reasons for the weight accorded the opinions of the examining physicians.[1] Dr.

---

[1] I am not convinced that the ALJ gave an appropriate reason for giving Dr. Shafer's opinion more weight than Dr. Wahl's opinion, however. The ALJ gave Dr. Wahl's opinion less weight because he examined Jackson in 2010. (Tr. 37, 770.) Dr. Shafer, a state agency psychologist, also completed his review in 2010 and relied on Dr. Wahl's opinion in assessing Jackson. (Tr. 775-91.) Jackson does not challenge the weight accorded the medical opinions, and any such argument is therefore not properly before the Court. [*See* Doc. 11 at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.").] In any event, any error in the weight accorded those opinions is harmless because the opinions of Dr. Wahl and Dr. Shafer are, as relevant to this appeal, consistent with Dr. Gratton's opinion and the ALJ's RFC assessment. *See Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008) (failure to state the weight accorded a state agency doctor's opinion was harmless where the opinion was consistent with other record evidence and ALJ's own conclusions); *see also Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983).

Gratton's opinion, on which the ALJ chiefly relied in assessing Jackson's mood-related symptoms, shows that Jackson's main difficulty in the workplace is that he does not get along with coworkers and supervisors. Witness statements made during the disability investigation indicate, however, that Jackson is able to have conversations and is generally pleasant when he is sober. When he is intoxicated, he is belligerent and gets into fights. (*E.g.*, Tr. 1583.)

As to Jackson's specific contention that the ALJ failed to properly evaluate his physical symptoms in light of his mental limitations, that argument is without merit. The ALJ considered Jackson's mental limitations alongside his physical limitations. Jackson does not have disabling musculoskeletal limitations or arthritis symptoms, however, and his physical examination with Dr. Sanford was mostly normal. During the administrative hearing, Jackson described his pain as an 8 out of 10 (Tr. 142), but he has at times reported that he is pain free. The objective medical evidence, including imaging and hospital visit records, does not support his claims of debilitating arthritis or pain. Drug and alcohol abuse—not chronic physical symptoms—are usually to blame for Jackson's hospital visits. When he was treated for severe dizziness or vertigo at the hospital, he had been "on a drinking spree for the last week." (Tr. 1656-59.) He also does not point to any

medical evidence of record linking his dizziness to hypertension. Jackson notes in his brief that he is hearing-impaired, but physicians' observations in the record evidence show that his hearing impairment does not affect his ability to understand normal speech adequately. (Tr. 1618.)

In short, Jackson does not point to record evidence suggesting that his physical impairments and subjective symptoms are exacerbated by his mood issues. There is record evidence from doctors and lay witnesses alike that Jackson's mental symptoms, including his irritability, are attributable to drug and alcohol abuse. Dr. Gratton found that his depression was related to his substance abuse problems. (Tr. 1614.) Thus, even if Jackson could show that his mental impairments leave him unable to deal with his physical symptoms, the problem is attributable to substance abuse—not depression or other mood and personality issues. Thus, the ALJ's conclusion that Jackson could do light work consistent with his RFC if he stopped the alcohol and drug abuse is supported by substantial evidence.

### C. Remand is not warranted under sentence six based on the new evidence Jackson has provided in this appeal.

Remand under sentence six of § 405(g) is authorized "upon a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C.

17

§ 405(g). A sentence six remand is not the result of any error by the Commissioner; rather, it allows the Commissioner to make findings of fact concerning new, material evidence. *Jackson v. Chater*, 99 F.3d 1086, 1095 (11th Cir. 1996). Sentence six remand is not warranted unless: (1) the evidence is new and noncumulative; (2) the evidence is material such that a reasonable probability exists that it would change the administrative results; and (3) there was good cause for the failure to submit the evidence at the administrative level. *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986).

Jackson has submitted evidence with his brief that shows he was seeking treatment at a behavioral health center in January and February 2017. The Court finds good cause for his failure to submit this evidence at the administrative level, because the evidence did not yet exist. *See Caulder*, 791 F.2d at 878. But the evidence is not material because it does not tend to show that, if he stopped abusing drugs and alcohol, Jackson would have limitations beyond what the ALJ considered in the RFC assessment. Moreover, in his decision, the ALJ considered Jackson's progress in seeking mental health treatment, including his claims at the hearing that he attended group meetings daily. (Tr. 31.) At the hearing, the ALJ also heard from Jackson's counsel about his graduation from Grady's substance

abuse and depression program. (Tr. 127.) Thus, evidence of Jackson's ongoing treatment is cumulative to the other evidence of Jackson's participation in mental health treatment programs.

## V.     CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Commissioner's final decision be **AFFIRMED**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned.

IT IS SO RECOMMENDED this 27th day of November, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge